# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 36556/36567

PRINTCRAFT PRESS, INC., )
)
    Plaintiff-Respondent-Cross-Appellant, )
)
v. )
)
SUNNYSIDE PARK UTILITIES, INC., an )
Idaho corporation, DOYLE BECK, an )
individual, and KIRK WOOLF, an )
individual, )
)
    Defendants-Appellants-Cross- )
    Respondents, )
)
and )
)
SUNNYSIDE PARK OWNERS )
ASSOCIATION, INC., an Idaho corporation, )
and SUNNYSIDE INDUSTRIAL AND )
PROFESSIONAL PARK, LLC, an Idaho )
limited liability corporation, )
)
    Defendants. )
_____ )
)
PRINTCRAFT PRESS, INC., )
)
    Plaintiff-Respondent, )
)
v. )
)
SUNNYSIDE PARK UTILITIES, INC., an )
Idaho corporation, )
)
    Defendant-Appellant, )
)
and )
)
SUNNYSIDE PARK OWNERS )
ASSOCIATION, INC., an Idaho corporation, )
and SUNNYSIDE INDUSTRIAL & )
PROFESSIONAL PARK, LLC, an Idaho )
limited liability company, DOYLE BECK, an )

Boise, January 2012 Term

2012 Opinion No. 105

Filed: July 2, 2012

Stephen Kenyon, Clerk

**individual and KIRK WOOLF, an individual,**  )
                                                )
    **Defendants.**                                    )

       Appeal from the District Court of the Seventh Judicial District of the State of Idaho, Bonneville County, Hon. Joel E. Tingey, District Judge.

       The district court's grant of SPU's motion under I.R.C.P. 60(b)(2) is <u>reversed</u>. The district court's denial of the defendants' motion for JNOV as to the existence and breach of a duty to disclose and as to the amount of damages is <u>affirmed</u>. The district court's order denying Printcraft's request for attorney fees below is <u>affirmed</u>.

       Fuller & Carr, Idaho Falls, for appellant Sunnyside Park Utilities, Inc.  Mark R. Fuller argued.

       Smith, Driscoll & Associates, PLLC, Idaho Falls, for appellants Beck and Woolf. Bryan D. Smith argued.

       Beard St. Clair Gaffney PA, Idaho Falls, for respondent.  Michael D. Gaffney argued.

———————————————————

HORTON, Justice

       This case arises from a dispute regarding the sewer system serving Sunnyside Industrial Park, LLC (the industrial park). Sunnyside Park Utilities (SPU) provides water and sewer services to the industrial park and Doyle Beck and Kirk Woolf are, respectively, the Secretary and President of SPU. Printcraft Press, Inc. (Printcraft) is a printing business that occupies a building in the industrial park. In 2004, via its principal, Travis Waters (Waters), Printcraft entered a ten-year lease for property in the industrial park. The dispute in this case concerns the failure of Beck, Woolf, and SPU to disclose limitations on the sewage system, including the amount of sewage the system could handle and its lack of suitability to dispose of some chemicals used in the printing business.

       After Printcraft started using the sewage system, SPU disconnected Printcraft from the system in December 2006. Printcraft sued SPU, Beck, and Woolf (collectively the defendants) for breach of contract, fraudulent nondisclosure, and fraud. At trial, the jury found that the defendants owed Printcraft a duty to disclose the limitations of the system and failed to do so. As a result, the jury found that Printcraft suffered $990,000 in damages. The trial court denied the

2

defendants' motion for judgment notwithstanding the verdict (JNOV) and entered judgment in favor of Printcraft on March 31, 2009. The defendants timely appealed and Printcraft timely cross-appealed. However, in August 2009, SPU filed a renewed motion for relief from judgment under Idaho Rule of Civil Procedure 60(b), asserting newly discovered evidence regarding whether Printcraft's damages claim was affected by its subsequent connection to the Idaho Falls city sewer system. The district court found that the newly discovered evidence satisfied the requirements of I.R.C.P. 60(b) and granted a new trial on the issue of damages.

On appeal, the defendants argue that they had no duty to disclose, that any failure to disclose did not lead Printcraft to believe any fact that was false, that the refusal to give SPU's requested jury instructions was improper, and that the district court erred in denying their motion for JNOV because there was not sufficient evidence to support the jury's determination of damages. In turn, Printcraft's cross-appeal argues that the district court erred in limiting the potential bases for the defendants' duty to disclose, that Printcraft's breach of contract claim was improperly dismissed, that the subsequent Rule 60(b) motion was improperly granted, that the issue of punitive damages should have been submitted to the jury, and that the judge erred in denying Printcraft's request for attorney fees. We affirm in part and reverse in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### 1. Factual background

The sewage system for the industrial park was a 1,000 gallon septic system with a capacity of 300 gallons per day until 2006 when the system was expanded to a 2,000 gallon per day capacity. In 2002, the industrial park entered a "Third Party Beneficiary Utility Agreement" (Third Party Agreement or the Agreement) with SPU to manage the industrial park's sewer system. The Third Party Agreement was made "for the benefit of the present and future owners of or occupants of all and each of the properties" in the industrial park. The Agreement called for SPU to supply "sewage collection of disposal service" to the buildings in the industrial park, excluding garbage collection. The Agreement authorized SPU to establish rules and regulations governing the sewer system. As noted above, Woolf was the president of SPU and Beck was the secretary. A sign was displayed at the industrial park, stating: "Sunnyside Industrial and Professional Park. Developed by: K.H. Woolf Development Co. . . . Water – Sewer – Intermountain Gas – County Taxes. Build to Suit KW Contractors, Inc."

In 2002, the District Seven Health Department sent a letter to Woolf regarding the SPU septic system. The letter informed Woolf that "no new connections will be allowed on the current sewer collection system until a Large Soil Absorption System, that replaces the current septic system, is approved and operating." At that point in 2002, there were eleven connections to the sewer system. By June of 2006, SPU added another seven connections to the system, including Printcraft's.

In 2004, Printcraft purchased a competing business and moved to the industrial park to consolidate the two businesses. Waters testified that he did not have to move the consolidated businesses into the industrial park, but did so to become more efficient. During this period, while Waters was preparing to move Printcraft, Waters met with Beck and Woolf a number of times in various capacities. These included: a meeting with Woolf in 2004 to discuss buying a lot in the industrial park; a brief meeting with Beck in 2004, discussing a railroad easement; a meeting with Beck in 2005 in which Waters gave Beck a preliminary sketch of the property; and in June or July of 2005, a meeting with Woolf regarding the need for approval of the building plans by the architectural committee, of which Beck was a member. At no time during these meetings was there any discussion of Printcraft's sewage needs nor was there any discussion of the system's limitations. Waters testified that before he moved Printcraft to the industrial park, he was not told of the Agreement, the limitations on the sewer system, or the rules and regulations associated with it. He testified that, had he known, he never would have moved Printcraft to the industrial park.

Waters, in addition to acting as principal for Printcraft, was also the owner of Waters Land and Cattle (WLC), CTR Development, and CTR Management. Through WLC, Waters purchased a lot in the industrial park from Mark Miskin, who is not involved in these proceedings. WLC then sold the property to CTR Development, which developed the property and paid SPU the connection fee for the septic services. CTR Development then sold the building to J&LB Properties, CTR Management entered a ten-year lease with J&LB, and Printcraft took possession of the building in 2006 under a ten-year sublease from CTR Management.

Shortly after Printcraft took possession of the building, there were at least two instances where the septic tank overflowed. The second of these overflows, in June 2006, resulted in inks pooling on the ground above the septic system. Waters met with Beck regarding Printcraft's

4

sewage and on September 6, 2006, Beck sent Waters a letter describing the system's limitations, most notably that it was only designed to accommodate human waste. On September 20, 2006, SPU's attorney sent a letter demanding that Printcraft comply with the applicable IDAPA provisions governing disposal in septic systems. Beck, Woolf, and Waters met on September 25 and reached an agreement as to the types of substances Printcraft could discharge. On December 11, 2006, SPU sent Printcraft a letter asserting that Printcraft was in breach of that agreement and threatening to disconnect Printcraft from the septic system. Printcraft denied that it was in violation of their agreement. SPU responded by stating that it would disconnect Printcraft from the system and, on December 15, 2006, Printcraft was disconnected. Following its disconnection, Printcraft obtained private sewer services at its own expense. It also pursued a connection to the Idaho Falls city sewer system. That connection was completed shortly after the trial.

## 2. Procedural history

Printcraft filed suit on December 18, 2006, and, by the time of its Third Amended Complaint, asserted two claims for breach of contract, one for fraudulent misrepresentation, and two counts of fraud. Printcraft also sought punitive damages. Printcraft claimed that it had incurred costs of $27,880 for moving into the industrial park, $15,098 for a lift station it installed to pump its waste into trucks for disposal away from the industrial park, and $12,000 per year for common-area maintenance at the industrial park. Printcraft also stated that the value of the 10-year lease at the industrial park was $1.08 million. SPU counterclaimed, asserting breach of contract, trespass, and nuisance.

The district court made a number of orders limiting the scope of these claims. Most notably, the district court denied SPU's motion for summary judgment as to the fraudulent misrepresentation claim, finding that, although there was neither a special relationship between the parties nor any partial, misleading statement, Printcraft could pursue its claim if it proved that it was mistaken about a material fact and that the defendants knew that it was mistaken. The court granted Printcraft's pre-trial motion to amend its complaint to include punitive damages claims against the defendants. The district court dismissed Printcraft's breach of contract claims, finding that because there was no dispute that it had discharged sewage in violation of IDAPA 58.01.03.004.03, Printcraft's illegal conduct justified the termination of its sewer service. The district court also dismissed Printcraft's fraud claim.

Printcraft's claims were limited to the fraudulent disclosure claim and the case went to trial. At trial, after putting forward evidence that it had not discharged illegal waste after September 2006, Printcraft moved for reconsideration of the order dismissing the breach of contract claim, which the district court denied. Printcraft rested its case in chief without presenting its evidence in support of its claim for punitive damages and the district court denied Printcraft's request to reopen its case to present that evidence. The defendants moved for a directed verdict after the close of their case, arguing again that no duty to disclose existed. The court denied the motion. Before the matter was submitted to the jury, the defendants objected to the court's refusal to give several of their proposed jury instructions. The jury returned a $990,000 judgment against the three defendants for fraudulent misrepresentation. The jury did not find Printcraft liable on any of SPU's counterclaims. The defendants moved for JNOV. The court denied this motion, finding that the jury's decision was supported by the evidence. The court, in a later decision, denied Printcraft's request for attorney fees. On April 2, 2009, the court entered judgment. The defendants timely appealed and Printcraft timely cross-appealed.

On August 20, 2009, the defendants moved for relief from the judgment based upon additional evidence under I.R.C.P. 60(b). In particular, they argued that three documents concerning the subsequent connection of Printcraft to the Idaho Falls sewer system constituted newly discovered evidence. The documents included: 1) the Right of Way Encroachment Application and Permit for Utilities; 2) the Plan and Profile for Printcraft Press Sewer Connection; and 3) the Notice of Intent to Excavate. They also argued that Waters' statement at trial that connecting to the Idaho Falls sewer system was not an option constituted fraud such that they were eligible for relief under I.R.C.P. 60(b)(3). After a hearing, the court entered an order granting the motion on the basis of I.R.C.P. 60(b)(2), newly discovered evidence, and 60(b)(6), regarding other grounds for relief.

## II. ISSUES ON APPEAL

1. Whether the district court abused its discretion in granting a new trial under Rule 60(b).

2. Whether the defendants owed Printcraft a duty to disclose the limitations of the septic system.

3. Whether the amount of damages was supported by substantial and competent evidence.

4. Whether the district court erred in dismissing Printcraft's breach of contract claim.

5. Whether the district court erred in denying Printcraft's motion to reopen its case to present evidence in support of its claim for punitive damages.

6

6. Whether the jury instructions fairly stated the law.

7. Whether the district court properly denied Printcraft's request for attorney fees at trial.

8. Whether any party is entitled to attorney fees on appeal.

## III. ANALYSIS

**A. The district court abused its discretion in granting the defendants' Rule 60(b) motion.**

Following entry of judgment in this case, the defendants sought a new trial on the issue of damages. They based their motion on: I.R.C.P. 60(b)(2), for relief based on newly discovered evidence; I.R.C.P. 60(b)(3), based on fraud; and I.R.C.P. 60(b)(6), which provides for relief based on "any other reason justifying relief from the operation of the judgment." The district court found that the defendants had not made a showing of fraud but that they were entitled to relief under I.R.C.P. 60(b)(2) and 60(b)(6) based on the newly discovered evidence regarding Printcraft's imminent connection to the Idaho Falls sewer system. We hold that the district court's grant of relief under I.R.C.P. 60(b) was an abuse of discretion because the district court failed to apply the correct legal standard in reaching its decision.

### 1. Standard of review

> The interpretation of the Idaho Rules of Civil Procedure is a matter of law over which this Court has free review. The decision to grant or deny a motion under I.R.C.P. 60(b) is committed to the discretion of the trial court.
>
> A trial court's decision whether to grant relief pursuant to I.R.C.P. 60(b) is reviewed for abuse of discretion. The decision will be upheld if it appears that the trial court (1) correctly perceived the issue as discretionary, (2) acted within the boundaries of its discretion and consistent with the applicable legal standards, and (3) reached its determination through an exercise of reason. A determination under Rule 60(b) turns largely on questions of fact to be determined by the trial court. Those factual findings will be upheld unless they are clearly erroneous. If the trial court applies the facts in a logical manner to the criteria set forth in Rule 60(b), while keeping in mind the policy favoring relief in doubtful cases, the court will be deemed to have acted within its discretion.

*Eby v. State*, 148 Idaho 731, 734, 228 P.3d 998, 1001 (2010) (internal citations omitted).

### 2. The district court abused its discretion in granting a new trial under I.R.C.P. 60(b).

In its order granting the motion for relief from judgment, the district court stated: "The primary issue under Defendant's [sic] motion is whether evidence that existed prior to trial to the effect that a connection to the City's system was possible/probable/imminent was not reasonably discoverable either under the circumstances, or due to Printcraft's misconduct." The court went on to say:

7

> In considering the record, this Court is satisfied that there are unique and compelling circumstances entitling Defendants to relief under Rule 60(b)(2). Newly discovered evidence relating to Printcraft's connection to the City's system was not discoverable by due diligence. That evidence is material to the issue of damages, not merely cumulative, and would likely have an effect on the damage award. *The Court does not find that Defendants are entitled to relief under Rule 60(b)(3).* However, the Court's finding that the newly discovered evidence was not previously discoverable is *in part* based upon Printcraft's discovery responses and obligation to supplement discovery. Under the circumstances, the Court also finds that Defendants are entitled to relief under Rule 60(b)(6).

(Emphasis added.) The district court expressly stated that its ruling was not based upon misrepresentation or other misconduct of an adverse party under Rule 60(b)(3). Instead, the court concluded that the evidence regarding Printcraft's connection to the City sewer system was not discoverable based in part on Printcraft's obligation to supplement discovery, which it found to be a unique and compelling circumstance under both I.R.C.P. 60(b)(2) and (6).

The district court appears to have conflated Rules 60(b)(2) and 60(b)(3). Rule 60(b)(2) allows for relief if the movant points to "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)," while Rule 60(b)(3) allows a court to grant relief if there is misconduct by an adverse party. Here, the court said that the defendants were not entitled to relief under 60(b)(3), but granted relief under 60(b)(2), based "in part" on Printcraft's alleged discovery misconduct. That holding inappropriately blends the two rules. If Printcraft committed misconduct warranting relief, then Rule 60(b)(3) should have applied; if the defendants could not have found "newly discovered evidence" through the exercise of due diligence, then Rule 60(b)(2) should have applied. While the court did conclude there was "newly discovered evidence" that was not discoverable by due diligence, it failed to explain what the evidence was or why it was previously undiscoverable. Nor did the court identify the other "part" of its reason for granting relief.

The court also applied a "unique and compelling circumstances" standard under Rule 60(b)(2). This standard circumscribes the trial court's discretion to grant relief under Rule 60(b)(6). The Court of Appeals first articulated the standard. *See In re Estate of Bagley*, 117 Idaho 1091, 1093–94, 793 P.2d 1263, 1265–66 (Ct. App. 1990) ("The party making a Rule 60(b)(6) motion must demonstrate unique and compelling circumstances justifying relief."). We then quoted the Court of Appeals' "unique and compelling" language in *Miller v. Haller*, where we considered a motion for relief under Rule 60(b)(6). 129 Idaho 345, 349, 924 P.2d 607, 611

8

(1996) (stating that "although the [trial] court is vested with broad discretion in determining whether to grant or deny a Rule 60(b) motion, its discretion is limited and may be granted only on a showing of 'unique and compelling circumstances' justifying relief."). Thus, even though we were deciding a decision involving Rule 60(b)(6), we spoke of the unique and compelling circumstances standard in terms of Rule 60(b) generally.

However, this Court has not previously applied the unique and compelling circumstances standard in the context of I.R.C.P. 60(b)(2). We have generally, but sparingly, applied it in cases where a party seeks relief under Rule 60(b)(6). *See Dawson v. Cheyovich Family Trust*, 149 Idaho 375, 380–81, 234 P.3d 699, 704–05 (2010); *Eby*, 148 Idaho at 736–37, 228 P.3d at 1003–04; *Berg v. Kendall*, 147 Idaho 571, 578–79, 212 P.3d 1001, 1008–09 (2009); *Miller*, 129 Idaho at 349 924 P.2d at 611. We have also applied the standard in cases where a party has sought relief from a judgment but failed to specify a particular subsection of Rule 60(b). *See Villa Highlands, LLC v. W. Cmty. Ins. Co.*, 148 Idaho 598, 604–05, 226 P.3d 540, 546–47 (2010); *Palmer v. Spain*, 138 Idaho 798, 802, 69 P.3d 1059, 1063 (2003). Given our limited application of the standard, it applies only to define the outer bounds of the trial court's discretion. Such delineation is unnecessary when considering a Rule 60(b)(2) motion because that subsection supplies its own limitation—the movant must show the existence of newly discovered evidence it could not previously have discovered by due diligence.

In this case, the trial court failed to articulate and correctly apply any existing Rule 60(b) standard. In the absence of an explanation as to why this case presented unique and compelling circumstances to trigger Rule 60(b)(6), the court abused its discretion in relying on that subsection to grant relief.

Rule 60(b)(2) only applies if there was "newly discovered evidence" that, by due diligence, was undiscoverable before the defendants could move for a new trial under Rule 59(b). Except for a passing reference to Printcraft's failure to supplement discovery, however, the court's order did not identify what evidence was "newly discovered." Nor did the court discuss whether any diligent attempts were made by the defendants to obtain such evidence. Nor did the court mention whether the defendants obtained the "newly discovered evidence" in time to move for a new trial under Rule 59(b).

It is clear from our review of the record that Printcraft made no attempt to conceal its efforts to connect to the city's sewer system. It is also clear from the record that this connection

9

would be a significant step toward mitigating Printcraft's damages. Nevertheless, the defendants were less than diligent in attempting to learn the status of Printcraft's efforts to obtain a connection.[1] It was within the defendants' power to have discovered Printcraft's intentions by exercising due diligence. If the defendants initially were unaware that Printcraft was seeking to connect to the City's sewer system and making significant progress in that regard, the Affidavit of Lawry Wilde, dated and served on the defendants' counsel on September 2, 2008, at least six months before trial, clearly should have placed the defendants on notice. In his affidavit, Wilde, who is a member of CTR Management, stated that he had been at an Idaho Falls City Council meeting on July 10, 2008, to urge the city to annex Printcraft's building into the City of Idaho Falls in order to obtain a sewer connection and that Doyle Beck appeared in order to express his opposition to the proposed annexation. Nevertheless, the City approved the annexation. The affidavit continues, stating the following as facts:

12. Printcraft will have a lift stationed [sic] installed at its building within approximately a week's time.

13. Arrangements have been made for accessing the City's sewer system via an easement with the railroad.

14. Mountain River Engineering has designed the system and process by which Printcraft will access the City's sewer system.

15. Printcraft has arranged for a contractor to perform the necessary work to connect Printcraft to the City's sewer system.

16. Printcraft is currently at the "permit" stage of annexation and it is nearly complete and Printcraft anticipates that it will be connected to Idaho Falls' sewer system within a matter of weeks.

Thus, it should have been apparent to the defendants that they needed to direct efforts toward obtaining information as to the progress of the sewer connection in order to counter any damage request made by Printcraft. The record does not reveal the defendants' exercise of any diligence in this regard.

None of the defendants' document requests relate to accessing city sewer services or mitigation of damages, nor do the defendants point to pertinent document requests to which

---

[1] Although not directly relevant to our analysis, it appears that the defendants' failure to investigate Printcraft's efforts to connect to the city sewer system is explained by a failed trial strategy. Defendants entirely focused their defense on the issue of liability, making no effort to present evidence regarding Printcraft's ability to mitigate its damages.

Printcraft did not properly respond. The three documents the defendants identified in their motion for relief—the Right of Way Encroachment Application and Permit for Utilities, the Plan and Profile for Printcraft Press Sewer Connection, and the Notice of Intent to Excavate—are not encompassed within the scope of any of those document requests. They are, however, within the scope of that which Wilde disclosed in his pre-trial affidavit.

Rather than pointing to a specific discovery request to which Printcraft did not respond, the defendants point to trial testimony of Travis Waters, which they contend constituted a statement that a sewer connection was "not an option." The defendants' characterization of Waters' testimony is not completely accurate. On cross-examination, counsel for defendant SPU asked Waters several questions about connecting to the city sewer, which Waters answered candidly:

> **Q. [by SPU's counsel]** And you're now trying to connect to the City of Idaho Falls, correct?
> **A. [by Waters]** That's our hopes.
> **Q.** Is it your position that that is the only option available to you now?
> **A.** Well, I can keep doing what I'm doing or I can hook up to the City. So yeah, I guess there's some options out there.
> **Q.** Isn't it correct that you either have to connect to the City or figure out some other option because Sunnyside disconnected you and refuses to provide you with sewer service?
> **A.** Yes.

On re-direct, Waters again discussed Printcraft's attempts to connect to the city sewer:

> **Q. [by Printcraft's counsel]** All right. [Counsel for SPU] asked you a question that says that you only have two options right now, basically stay where you are and deal with the situation or connect to the City. As we sit here right now, has that option come to any fruition?
> **A. [by Waters]** No.
> **Q.** Now, Printcraft – has Printcraft made some attempts to go that route?
> **A.** We've made a lot of attempts to work towards that.
> **Q.** Okay. Did the lot get annexed into the City?
> **A.** Yes.
> **Q.** And we talked about that with Mr. Beck, correct?
> **A.** Correct.
> **Q.** All right. But as we sit here today, that is not an option, right?
> **A.** That hasn't happened.

Waters' answer—"That hasn't happened"—was not directly responsive to the question of whether Printcraft had the immediate option of connecting to the sewer; but neither was it an incorrect answer. On the record before us, it is evident that Waters' ambiguous response did not

11

excuse the defendants from their obligation to exercise due diligence in advance of trial to develop evidence that Printcraft could have mitigated its claimed damages.

While the district court has broad discretion to rule on a Rule 60(b) motion, its discretion is not without limit. In light of the record, the trial court's failure to articulate its reasoning, and its failure to correctly apply Rule 60(b), we hold that the district court abused its discretion in granting the defendants a new trial on damages.

**B. The district court did not err in submitting the issue of the defendants' duty to disclose to the jury and the jury's finding is supported by substantial and competent evidence.**

The district court partially granted SPU's motion for summary judgment regarding the defendants' duty to disclose the limitations on the septic system. A duty to disclose may arise:

> (1) if there is a fiduciary or other similar relation of trust and confidence between the two parties; (2) in order to prevent a partial statement of the facts from being misleading; or (3) if a fact known by one party and not the other is so vital that if the mistake were mutual the contract would be voidable, and the party knowing the fact also knows that the other does not know it.

*Sowards v. Rathbun*, 134 Idaho 702, 707, 8 P.3d 1245, 1250 (2000). The district court granted the defendants' motion for summary judgment as to the first and second prongs of *Sowards*. The defendants now argue that the district court erred by denying summary judgment as to the third prong. Printcraft cross-appeals, arguing that the district court erred in dismissing claims based on the first two prongs of *Sowards*. We affirm.

1. Standard of review

The parties assert that the existence of a duty is a matter of law. While generally true, that statement is not always correct. The Restatement (Second) on the Law of Torts states the rule as:

> Whether there is a duty to the other to disclose the fact in question is always a matter for the determination of the court. If there are disputed facts bearing upon the existence of the duty, as for example the defendant's knowledge of the fact, the other's ignorance of it or his opportunity to ascertain it, the customs of the particular trade, or the defendant's knowledge that the plaintiff reasonably expects him to make the disclosure, they are to be determined by the jury under appropriate instructions as to the existence of the duty.

Restatement (Second) of Torts § 551 cmt. m (1977). Likewise, a federal district court phrased the inquiry as follows:

> Thus, the court must decide in the first instance whether the circumstances asserted, if proved, would be sufficient to give rise to a duty to disclose; if the court finds the circumstances alleged would be sufficient, the jury will then be presented with the factual question of whether those circumstances indeed

12

existed, provided of course, at the summary judgment stage of the proceedings, the plaintiff can generate a genuine issue of material fact as to the existence of those circumstances.

*Jones Distrib. Co. v. White Consol. Indus., Inc.*, 943 F.Supp. 1445, 1474 (N.D. Iowa 1996). *See also Zawaideh v. Nebraska Dep't of Health & Human Servs. Reg. & Licensure*, 792 N.W.2d 484, 496 (Neb. 2011). Consequently, it is the district court that determines whether, as a matter of law, the facts asserted would give rise to a duty to disclose if they are proven. But once it makes that determination, it falls to the jury to decide whether those facts are proven, and thus whether there was a duty to disclose.

Because the question regarding duty under the third prong was submitted to the jury, the issue on appeal is whether the district court erred in denying the defendants' motion for JNOV. When we review a district court's decision to grant or deny a motion for JNOV, this Court:

> employs the same standard the district court used in ruling on the motion. An order granting a j.n.o.v. is appropriate when "the facts are undisputed" and "there can be but one conclusion as to the verdict that reasonable minds could have reached"—namely, that the moving party should prevail. On the other hand, a verdict will be upheld when it is supported by substantial and competent evidence. Substantial evidence is evidence of "such sufficient quantity and probative value that reasonable minds could conclude that the verdict of the jury was proper." Evidence may be substantial even though it is contradicted.

*Coombs v. Curnow*, 148 Idaho 129, 136, 219 P.3d 453, 460 (2009) (citations omitted).

<u>2. The court properly applied the test for whether a party has a duty to disclose.</u>

At the outset, because the parties argue a variety of interrelated issues, it is important to define the scope of the duty to disclose and the points of contention with respect to the district court's ruling. The district court summarized the bases of Printcraft's argument in favor of a duty to disclose:

> (1) under the terms of the [Third Party] Agreement; (2) because the development was named "Sunnyside Professional and Industrial Park" indicating that industrial activity was permitted; (3) pursuant to a letter sent by District Seven to SIPP on April 15, 2002 indicating that District Seven prohibited further sewer connections to SIPP; and (4) because Woolf and/or Beck knew of the nature of Printcraft's business from the blueprints, but failed to warn Waters of the septic system's limitations.

In holding that the question of whether the facts of this case fit the third prong of *Sowards* was a question for the jury, the district court stated:

By affidavit, Waters testified that the [sic] Woolf and/or Beck understood the nature of the business and its need for a septic connection, but failed to disclose several deficiencies with the system. . . . Waters further testified that he did not know the limitations of the septic system.

The district court later stated:

[T]he Court assumes (and it does not seem to be disputed) that Printcraft had no knowledge as to the limitations/restrictions applicable to the septic system. The issue then is whether, as a matter of law, there is no evidence that Beck or Woolf know that Printcraft did not have that knowledge.

Printcraft has presented evidence supporting the inference that Beck and Woolf knew that Printcraft did not know of material issues relating to the septic system, since (arguably) such information could only have been obtained from Beck or Woolf. Such an inference precludes granting summary judgment on this issue. It is worth noting that the decision in *Sowards*, where it was found that the plaintiff failed to prove the "knowledge" element of a nondisclosure claim, was based upon a finding of fact by the trier of fact, after all evidence was presented at the time of trial.

From these statements and the parties' arguments, three issues are presented on appeal: (a) whether a plaintiff can ever assert a fraudulent misrepresentation claim as a third party beneficiary; (b) whether any of the various bases of a proposed duty to disclose support the finding of such a duty in this case; and (c) whether substantial and competent evidence supports the jury's verdict that the defendants breached this duty.

### a. Third party beneficiaries may be owed a duty to disclose.

The defendants rely on three arguments in support of their assertion that no duty to disclose exists with regard to a third party beneficiary. First, they argue that the class of potential future beneficiaries is undefined and therefore unlimited. This argument is not persuasive because it ignores the reality that the duty to disclose is the product of some form of relationship, interaction, or communication between the parties that necessarily limits the prospective class of plaintiffs to parties known to the defendant. Considering the three instances where the duty to disclose may arise, it requires: (a) that there be a fiduciary or similar relationship of trust between the parties; (b) that the defendant both possess knowledge of facts and awareness that those facts must be disclosed in order to prevent a partial statement of the facts from misleading the plaintiff; or (3) know that the plaintiff is about to enter into a transaction under a mistaken belief of the facts. Each of these circumstances requires that the defendant possess knowledge about the potential plaintiff, foreclosing the possibility that some unknown or unforeseen plaintiff may advance a claim.

14

Second, the defendants point to the brief reference in *Chavez v. Barrus*, 146 Idaho 212, 223 n.6, 192 P.3d 1036, 1047 n.6 (2008) where we stated that "this Court has not previously engrafted the body of contract law relating to third-party beneficiaries to the law of intentional torts." But, as the district court pointed out, the statement in *Chavez* can easily be read to indicate "that in a claim for intentional torts . . . , contractual elements and third party beneficiary status are not relevant to the inquiry whether the elements of fraud have been proven." It should be noted that, within the context of *Chavez*, the issue of third party beneficiary status had already been disposed of by a finding that the plaintiff was not a beneficiary. 146 Idaho at 223 n.6, 192 P.3d at 1047 n.6.

Third, the defendants argue that finding a duty to disclose to third party beneficiaries is against public policy because it would create numerous lawsuits. They do not specify the kinds of lawsuits that would result nor do they explain how the misrepresentation by silence would implicate the concern, as expressed in *Harrigfeld v. Hancock*, that a wide-ranging duty "would subject attorneys to lawsuits by persons who simply did not receive what they believed was their fair share of the testator's estate, or who simply did not receive in the testamentary instruments what they understood the testator had stated or indicated they would receive." 140 Idaho 134, 138-39, 90 P.3d 884, 888-89 (2004). We find this argument unpersuasive. To the contrary, we can discern no public policy that would be advanced by permitting parties to consciously misrepresent a contract that will benefit them to the detriment of a third party, simply because that person or entity is not a party to the contract. That the prospective plaintiff must satisfy the requirements of *Sowards* before a duty will arise suggests that the floodgates of litigation will not be opened by this holding.

In contrast, in *Harrigfeld,* this Court recognized that a defendant may owe limited duties to a third party. 140 Idaho at 138, 90 P.3d at 888 (recognizing an attorney's duty to third party beneficiaries that would form the basis for a negligence claim). In addition, the Restatement supports the contention that third parties may be owed a duty of disclosure. Section 532 of the Restatement states:

> One who embodies a fraudulent misrepresentation in an article of commerce, a muniment of title, a negotiable instrument or a similar commercial document, is subject to liability for pecuniary loss caused to another who deals with him *or with a third person regarding the article or document in justifiable reliance upon the truth of the representation.*

15

Restatement (Second) of Torts, § 532 (emphasis added). That this provision is applicable to cases involving a duty to disclose can be seen in the cases of a variety of other jurisdictions. *E.g., Peerless Mills, Inc. v. AT&T*, 527 F.2d 445, 450 (2d Cir. 1975) ("A third party can recover damages for a fraudulent misrepresentation if he can establish that he relied upon it to his detriment, and that the defendants intended the misrepresentation to be conveyed to him."); *Nader v. Allegheny Airlines, Inc.*, 512 F.2d 527, 547-48 (D.C. Cir. 1975) ("It is unequivocal that privity of contract is not a prerequisite to recovery where the plaintiff proves fraudulent misrepresentation.") (*rev'd on other grounds by Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290 (1976)). Therefore, we hold that a duty to disclose may arise in the context of third party beneficiaries.

### b. *A duty to disclose arose under the facts of this case.*

The district court focused on the fact that the defendants knew of the nature and size of Printcraft's business. It is a reasonable inference that the defendants therefore knew or had reason to know that Printcraft might dispose of materials or quantities that the industrial park's septic-based sewer system was not capable of handling. Waters testified that he did not know the limitations of the system and would not have moved to the industrial park had he known about those limitations. Thus, the limitations of the sewer system were facts known by one party and not the other. Waters' testimony demonstrated that an adequate sewer system was vital to Printcraft's business. The evidence likewise supports a finding that the defendants knew that Printcraft did not know about those limitations. On these facts, Printcraft's claim that the defendants breached their duty to disclose under the third prong of *Sowards* was properly submitted to the jury.

On appeal, the defendants argue that because IDAPA prohibits discharge of water softener brine into a septic system, Printcraft had no right to rely on the assumption that they could dispose of all of their wastes. However, IDAPA 58.01.03.004.03, which governs septic systems, states: "Cooling water, backwash or backflush water, hot tub or spa water, air conditioning water, water softener brine, groundwater, oil, or roof drainage cannot be discharged into any system unless that discharge is approved by the Director." This may have rendered SPU's actions in disconnecting Printcraft from the septic system legal, but it did not make the contract per se illegal. First, IDAPA 58.01.03.004.03 only controls septic systems. If the industrial park had been connected to the Idaho Falls sewer system or some other, non-septic

16

based sewage disposal system, there is no evidence that Printcraft would not have been able to dispose of its wastewater. Second, the IDAPA provision specifically allows for otherwise-prohibited discharge into a septic system upon approval by the Director. There is no evidence presented that SPU sought such approval, much less that the Director denied a request to permit discharge of Printcraft's waste.[2] Thus, it may have been possible for Printcraft to use the septic system. As such, the application of the third party beneficiary agreement to Printcraft did not render it an illegal contract.

The defendants also aggressively advance the proposition that because Printcraft was connected to the septic system the duty to disclose was not triggered. The fact that Printcraft was connected does not require the conclusion that the defendants owed no duty of disclosure. Rather, this fact goes to the materiality of the information regarding the sewage system's limitations. As the district court properly concluded, materiality is a question of fact. *In re Tobacco II Cases*, 207 P.3d 20, 39 (Cal. 2009); *Powers v. United Servs. Auto. Ass'n*, 979 P.2d 1286, 1289 n.5 (Nev. 1999); *Berkeley Bank for Coops. v. Meibos*, 607 P.2d 798, 801 (Utah 1980). The fact that Printcraft was connected to the septic system merely indicates that it was, in fact, a third party beneficiary of the Agreement. Whether the defendants breached a duty to disclose is a separate question, discussed below.

### c. The jury's determination that the defendants breached their duty to disclose is supported by substantial and competent evidence.

The key argument made by the defendants on appeal is that, even assuming that some duty to disclose arose, they did not breach that duty. As noted, a district court's denial of a motion for JNOV is proper when the verdict was "supported by substantial and competent evidence," which is evidence that would permit a reasonable mind to conclude that the jury's

---

[2] We note that the Agreement required SPU to provide adequate sewage disposal facilities and that SPU was required to foot the bill for those facilities. Section 2(b) of the Agreement provides, in pertinent part:

> The Company shall provide at all times for each of the buildings … sewage service adequate for safe and sanitary collection and disposal of all sewage from said buildings…. The Company further shall operate and maintain the sewage systems, including the disbursement field, in a manner so as not to pollute the ground, air, or water in, under, or around said areas or subdivisions with improperly or inadequately treated sewage. … The Company further agrees to operate the systems in accordance with regulations and recommendations of the State Board of Health…. In the event said Board shall determine that the operations of the systems do not meet the said regulations or recommendations, the Company shall immediately, at its sole cost and expense, make any adjustment, repair, installation or improvement to its facilities that shall be necessary or required or recommended by said Board to bring the operation of the systems up to the said regulations and recommendations.

verdict was proper. *Coombs v. Curnow*, 148 Idaho 129, 136, 219 P.3d 453, 460 (2009) (citation omitted). "Evidence may be substantial even though it is contradicted." *Id.*

Here, it is uncontroverted that none of the defendants ever disclosed the limitations of the septic system to Waters. Additionally, there was evidence presented to support the claim that Printcraft did not know about the limitations on the system, as Waters testified that, had he known of those limitations, he would not have relocated to the park. The fact that a large sign indicated that sewer services were provided to the industrial park certainly did nothing to place Waters on notice of those limitations. Finally, the fact that Printcraft's business involved waste that would have breached IDAPA 58.01.03.004.03 suggests that the ability to have a sewer system that would accommodate that waste was a material condition of Printcraft's decision to choose the industrial park as a site for its business. Under these circumstances, the jury was certainly free to accept Waters' statement that he would not have moved Printcraft's business to a location unable to accommodate the discharge of its waste.

The defendants further argue that there could not have been a breach because no damages resulted. In support of this argument, the defendants point to the fact that, until Printcraft was disconnected for violating IDAPA 58.01.03.004.03, SPU accepted, and disposed of, all of Printcraft's waste.[3] However, the fact remains that Printcraft was still unable to dispose of its waste based on the nature of that waste. Even if the septic system's limitations regarding the *amount* of waste would not have created a duty to disclose (since, with the exception of the limits provided in the September 2006 agreement, all of Printcraft's waste water was accepted by SPU), the failure to disclose the limitations on the *types* of waste provides substantial and competent evidence that the defendants breached the duty to disclose. We therefore affirm the district court's denial of the motion for JNOV.

Because we affirm the district court's decision with regard to the duty to disclose under the third prong of *Sowards*, we do not reach Printcraft's cross-appeal arguments regarding the existence of a duty under the other two prongs.

---

[3] Based on the September 2006 discussions between the parties, it appears the amount of waste was an issue. However, Printcraft's agreement to limit its discharges suggests that the amount was not a material condition of its decision to relocate.

**C. The jury's damage award was supported by substantial and competence evidence.**

1. Standard of review

When reviewing a district court's decision to grant or deny a motion for JNOV, the standard this Court uses is:

> the same standard the district court used in ruling on the motion. An order granting a j.n.o.v. is appropriate when "the facts are undisputed" and "there can be but one conclusion as to the verdict that reasonable minds could have reached"—namely, that the moving party should prevail. On the other hand, a verdict will be upheld when it is supported by substantial and competent evidence. Substantial evidence is evidence of "such sufficient quantity and probative value that reasonable minds could conclude that the verdict of the jury was proper." Evidence may be substantial even though it is contradicted.

*Coombs*, 148 Idaho at 136, 219 P.3d at 460 (citations omitted). When applying this standard, "the Court may not reweigh evidence, consider witness credibility, or compare its factual findings with that of the jury." *Horner v. Sani-Top, Inc.*, 143 Idaho 230, 233, 141 P.3d 1099, 1102 (2006) (citing *Griff, Inc. v. Curry Bean Co., Inc.,* 138 Idaho 315, 319, 63 P.3d 441, 445 (2003)). "This Court reviews the facts as if the moving party had admitted any adverse facts, drawing reasonable inferences in favor of the non-moving party." *Id.* (citing *Ricketts v. E. Idaho Equip. Co., Inc.*, 137 Idaho 578, 580, 51 P.3d 392, 394 (2002)).

2. The jury's award of damages was supported by substantial and competent evidence.

The defendants argue that the jury's award of damages was not supported by substantial and competent evidence and therefore the district court erred in denying the request for JNOV. The defendants contend that Printcraft may not claim any damages related to disposing of its waste because those damages are a result of its disconnection from the industrial park's septic system.[4] They argue that Printcraft's illegal conduct in discharging prohibited material into the system was a superseding intervening cause of the damages. Beck and Woolf also argue that even if Printcraft had not leased space at the industrial park, it would have leased new premises somewhere. Therefore, they argue, Printcraft cannot claim lease payments as damages because it would have incurred lease costs anyway. Printcraft responds that all the damages were the result of the defendants' failure to disclose the limitations of the system and that it would not have incurred any of its claimed damages if proper disclosures had been made because it would not have moved into the industrial park.

---

[4] The district court expressly ruled that the disconnection was lawful and thus, that no award of damages could be based upon the termination of septic services.

19

Waters testified that Printcraft moved into the industrial park to be more efficient, but that it did not have to move from its previous location:

> **Q. [on cross-examination]** But the truth is, had you not moved into this building, you were going to move into some other building, weren't you?
> **A. [by Waters]** Well, no. I didn't have to move. I could have leased both those buildings and kept going the way we were. I was moving to become more efficient.

Waters also testified that had he known about the limitations of the septic system at the industrial park, Printcraft would not have relocated there:

> **Q.** If Printcraft had known prior to moving, before moving, that there was a prohibition by District Seven Health directed to Sunnyside Park Utilities that no more buildings could connect or there would be no more connections to the septic system, had you known that information, would you have moved?
> **A**: No.
> **Q**: If you had known prior to moving that there were rules and regulations related to disposal of septic [sic] in the industrial park, rules put out by Sunnyside Park Utilities that you couldn't dispose of industrial waste from your facility, would you have moved?
> **A**: No.

Printcraft also provided evidence of the costs it incurred moving into the industrial park, the value of the lease over its 10-year term, and the cost of common-area maintenance at the industrial park.

When all of the evidence and inferences drawn from the evidence are viewed in the light most favorable to Printcraft, there is sufficient evidence to support the jury's award of damages. The jury could reasonably have concluded from Waters' testimony that the defendants' nondisclosure caused Printcraft to enter into a lease that it would not otherwise have executed. While the defendants contend that Printcraft would have incurred these costs even absent the nondisclosure, the weight and credibility of the evidence are for the jury to decide. We hold that there is substantial and competent, though conflicting, evidence to support the jury's conclusion regarding the amount of damages caused by the defendants' nondisclosure. Therefore, we affirm the district court's denial of the motion for JNOV.

**D. We do not reach the question of the dismissal of Printcraft's breach of contract claim.**

On cross-appeal, Printcraft argues that the district court erred in dismissing its breach of contract claim. However, the damages Printcraft alleges in this claim are the same that it claims as a result of the fraudulent misrepresentation claim. Thus, because we affirm the district court

on the issue of fraudulent misrepresentation, and these damages are duplicative, we need not reach this issue. *See Seiniger Law Office, P.A. v. N. Pac. Ins. Co.*, 145 Idaho 241, 248, 178 P.3d 606, 613 (2008) (declining to remand on a separate cause of action where damages were identical).

**E. The district court did not abuse its discretion in denying Printcraft's motion to reopen its case in chief to present evidence on its claim for punitive damages.**

1. Standard of review

> The decision whether to reopen a case and receive additional evidence before final judgment involves an exercise of discretion and will not be disturbed absent a showing that such discretion was abused. *See Seubert Excavators, Inc. v. Eucon Corp.,* 125 Idaho 409, 416, 871 P.2d 826, 833 (1994). On review, this Court must determine whether the lower court correctly perceived the issue as one of discretion, whether the court acted within the outer boundaries of such discretion and consistently with any legal standards applicable to specific choices, and whether the court reached its decision by an exercise of reason. *See id.*

*Idaho Power Co. v. Cogeneration, Inc.*, 134 Idaho 738, 744, 9 P.3d 1204, 1210 (2000). When a party seeks to reopen, it "must show some reasonable excuse, such as oversight, inability to produce the evidence, or ignorance of the evidence. *Id.* (citing *Smith v. Smith,* 95 Idaho 477, 481, 511 P.2d 294, 298 (1973)).

2. The district court properly exercised its discretion.

Printcraft argues that the district court erred in declining to submit its claim for punitive damages to the jury because Printcraft rested its case in chief without presenting any evidence in support of its claim. Printcraft contends that because punitive damages are permitted in fraud claims, and the district court instructed the jury regarding fraud by nondisclosure, the jury should also have been instructed as to punitive damages. Printcraft is correct that Idaho Code § 6-1604(1), governing punitive damages, provides that:

> In any action seeking recovery of punitive damages, the claimant must prove, by clear and convincing evidence, oppressive, fraudulent, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted.

However, the district court's decision was rendered on the basis that Printcraft had rested its case without presenting evidence to support an award of damages and without seeking guidance from the court, holding that it was improper to reopen to address the omission. After defense counsel objected to Printcraft's request to question a witness in support of its punitive damages claim,

21

Printcraft's attorney gave his reason for not having presented his evidence for the claim during Printcraft's case in chief:

> Your Honor, typically what would happen is, the Court would instruct the jury yes or no; and then it would be—I think it would be bifurcated to come back and present that evidence Typically that's the way it would happen. I'm just trying to speed things up.

Thus, Printcraft's decision was not an oversight, nor was it based on its inability to present the evidence, nor on ignorance of the evidence. Rather, it appears counsel intended to present the evidence at a later point in the trial.

While Printcraft characterizes the district court's decision as simply dismissing its claim for punitive damages, the court's actual statement was:

> Well, as I recall my ruling on that, I think I indicated that once your—once you presented your evidence on everything but punitive damages, then we'd take up the issue whether I was going to even allow that to go to the jury; and then I'd make a determination whether to let you go forward with evidence on that.
> . . .
> I mean, I was primed to make a ruling at the end of plaintiff's case on this because I expected that issue to come up. It didn't. And so when [Printcraft] rested, I figured [punitive damages were] now a nonissue. So I think that's still the case. It's a nonissue. It wasn't raised at the end of the nonpunitive damage case.

Thus, the court recognized it had a discretionary decision to make and then exercised reason to determine that it would not reopen the case. The district court did not act outside the boundaries of its discretion nor in contradiction of the applicable legal standards because, as noted, this Court has recognized the power of a district court to reopen a case prior to final judgment. The court also reached its decision through an exercise of reason. Consequently, we hold that the trial court did not abuse its discretion in declining to permit Printcraft to reopen its case to present evidence to support its punitive damages claim to the jury.

**F. The district court did not commit reversible error regarding the jury instructions.**

### 1. Standard of review

> The standard of review for issues concerning jury instructions is limited to a determination of whether the instructions, as a whole, fairly and adequately present the issues and state the law. When the instructions, taken as a whole, do not mislead or prejudice a party, an erroneous instruction does not constitute reversible error.

*Chapman v. Chapman*, 147 Idaho 756, 762, 215 P.3d 476, 482 (2009). We hold that the district court's instructions fairly and adequately presented the issues and stated the governing law.

2. The district court properly refused to give a jury instruction precluding damages resulting from Printcraft's disconnection from the industrial park septic system.

SPU contends that the exclusion of its Proposed Jury Instruction No. 16 allowed the jury to award damages that were caused by SPU's lawful termination of Printcraft's septic system connection. Proposed Instruction No. 16 stated: "Printcraft is not entitled to recover any damages which were caused by Sunnyside Park Utilities' disconnection of Printcraft's septic service, as the termination was justified by Printcraft's discharge of illegal substances into the septic system." Instead, the jury was instructed that it could award damages only if it found that Printcraft "suffered damages proximately caused by" the defendants' failure to disclose the limitations of the septic system. SPU argues that the instruction was incomplete as it did not inform the jury that Printcraft was not entitled to damages caused by the disconnection. We disagree.

When it made its ruling excluding the possibility of damages based upon the disconnection, the court also stated that whether any wrongful act by SPU proximately caused damages to Printcraft was a question for the jury. The court then specifically instructed the jury in instruction 26 "[t]he Court has previously ruled as a matter of law that due to Plaintiff's unlawful discharge, Defendant lawfully terminated the septic system connection to the building occupied by Plaintiff." The jury was also instructed as to proximate cause and that any damages must have resulted from the defendants' wrongful conduct of failure to disclose. Together, these instructions served to indicate to the jury that any damages Printcraft suffered as a result of the disconnection, rather than from its reliance on the nondisclosed limitations on the sewer system, were not permitted. Therefore, we hold that the failure to give SPU's Proposed Jury Instruction No. 16 was not error.

3. The district court properly refused to give a jury instruction regarding settlement agreements.

SPU argues that the lack of any jury instruction regarding settlement agreements was reversible error. It contends that the letters between Printcraft and SPU in September 2006 created a settlement agreement that limited its liability. These letters, it argues, constitute sufficient evidence of a settlement agreement such that a jury instruction on settlement

23

agreements should have been submitted to the jury. SPU further points to the statement the district court made in dismissing its motion for JNOV that "the jury's conclusion that Printcraft's claims were not defeated by any alleged compromise agreement is supported by substantial and competent evidence . . . ." SPU contends that this statement means that the jury decision was affirmed on a basis that they had no ability to challenge.

The defendants correctly cite *Wilson v. Bogert*, 81 Idaho 535, 347 P.2d 341 (1959) for the following proposition:

> Where the parties to a legal controversy, in good faith enter into a contract compromising and settling their adverse claims, such agreement is binding upon the parties, and, in the absence of fraud, duress or undue influence, is enforceable either at law or in equity according to the nature of the case.

*Id*. at 542, 347 P.2d at 345 (citations omitted).

Although this is an accurate statement of the law and the defendants are correct in their assertion that the district court erred in its description of "the jury's conclusion," the only evidence presented at trial which the defendants have identified as supporting the requested instruction is Exhibit AN. That document reveals that the extent of the parties' agreement was that Printcraft would "no longer be putting the RO water into the sewer system" and that Printcraft would "make arrangements to collect and dispose of what [the defendants] classify as 'processed waste.'" The defendants have failed to direct our attention to evidence presented at trial that would permit a reasonable trier of fact to conclude that the parties' discussion and agreement as to the types of waste that Printcraft would discharge constituted an agreement "compromising and settling their adverse claims." "An instruction is not to be given if it is . . . not supported by the facts . . . ." *Vanderford Co. v. Knudson*, 144 Idaho 547, 555, 165 P.3d 261, 269 (2007). In short, SPU has shown no error in the failure to instruct the jury on settlement agreements.

### 4. The district court properly refused to give a jury instruction regarding the doctrine of superseding cause.

SPU argues that it was entitled to a jury instruction regarding superseding cause and that no instruction was given which adequately addressed the defendants' claim that any damages claimed by Printcraft were caused by SPU's lawful act of disconnecting Printcraft's sewer service. However, as we previously explained, the jury was instructed that SPU lawfully terminated Printcraft's septic system connection and any damages must have been the result of

24

SPU's wrongful conduct –– in this case, the nondisclosure of the sewer system's limitations. As we stated regarding the exclusion of SPU's Proposed Instruction No. 16, the jury instructions were adequate to indicate to the jury that only those damages Printcraft suffered as a result of the breach of the duty to disclose material facts were permitted.

A superseding cause refers to an independent act or force that breaks the causal chain between a defendant's culpable act and the claimed injury. *State v. Lampien*, 148 Idaho 367, 374, 223 P.3d 750, 757 (2009). The dispute in this case centered on whether the defendants failed to disclose the limitations as to the type and quantity of waste that Printcraft could discharge with knowledge that this information was material to Printcraft's decision to relocate to the industrial park. Although the district court found that SPU's act of disconnecting Printcraft was lawful, this does not dictate the conclusion that the lawful disconnection was a superseding cause of Printcraft's claimed injury. Regardless of whether Printcraft was prohibited by law from discharging its waste into the septic system, or prohibited in fact by the physical disconnection from the system, the lack of access to a suitable sewage disposal system was the source of the damages at the heart of Printcraft's claim. The particular fashion in which the claimed injury arose did not break the causal chain between the claimed breach of duty and the claimed damages. The district court properly refused to give the requested instruction.

<u>5. The district court properly refused to give jury instructions regarding the district court's pre-trial orders.</u>

After the district court limited the defendants' opening statements by prohibiting a recitation of the court's pre-trial orders, the defendants submitted an amended list of proposed instructions that included those pre-trial rulings. The district court declined to give the additional instructions. Printcraft argues that Proposed Jury Instructions 38-42 were untimely and therefore properly excluded. SPU admits as much. The instructions were, therefore, properly excluded. The fact that this may not have been the basis of the district court's decision is irrelevant upon appeal. "Where an order of a lower court is correct, but based upon an erroneous theory, the order will be affirmed upon the correct theory." *McGrew v. McGrew*, 139 Idaho 551, 559, 82 P.3d 833, 841 (2003).

25

**G. The district court properly denied Printcraft's request for costs and attorney fees.**

Printcraft asks this Court to reverse the district court's denial of its request for attorney fees below under I.C. § 12-120(3) and additionally requests attorney fees on appeal under the same statutory provision. Therefore, the issues are treated together.

Printcraft was the prevailing party below. "An award of attorney fees under Idaho Code § 12-120(3) is proper if a 'commercial transaction is integral to the claim, and constitutes the basis upon which the party is attempting to recover.'" *Meyers v. Hansen*, 148 Idaho 283, 292, 221 P.3d 81, 90 (2009) (quoting *Brower v. E.I. DuPont De Nemours & Co.*, 117 Idaho 780, 784, 792 P.2d 345, 349 (1990)).

> The awarding of attorney fees under I.C. 12-120(3) is reviewed for an abuse of discretion. *Fox v. Mountain West Elec., Inc.*, 137 Idaho 703, 711, 52 P.3d 848, 856 (2002). To prove an abuse of discretion this Court looks to three factors: (1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the boundaries of its discretion and consistent with legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason. *Id.* However, whether a statute awarding attorney fees applies to a given set of facts is a question of law and subject to free review. *Ransom v. Topaz Marketing, L.P.*, 143 Idaho 641, 644, 152 P.3d 2, 5 (2006).

*Vanderford Co.*, 144 Idaho at 552, 165 P.3d at 266. "Whether a district court has correctly determined that a case is based on a "commercial transaction" for the purpose of I.C. § 12-120(3) is a question of law. This Court exercises free review over questions of law." *Fritts v. Liddle & Moeller Const., Inc.*, 144 Idaho 171, 173, 158 P.3d 947, 949 (2007) (internal citations omitted).

This Court has held that only the parties to the commercial transaction are entitled to attorney fees under I.C. § 12-120(3). *E.g. BECO Constr. Co. v. J-U-B Eng'rs, Inc.*, 145 Idaho 719, 726, 184 P.3d 844, 851 (2008); *Soignier v. Fletcher,* 151 Idaho 322, 327, 256 P.3d 730, 735 (2011); *Harris, Inc. v. Foxhollow Constr. & Trucking, Inc.*, 151 Idaho 761, 778, 264 P.3d 400, 417 (2011). Thus, even though fees are available in cases involving a tort claim, a commercial transaction *between the parties to the lawsuit* must form the basis of the claim.

In this case, the issue is whether there was a commercial transaction between Printcraft and any of the defendants. Waters admitted at trial that there were no contracts between

26

Printcraft and either Beck, Woolf, or SPU.[5] Instead, Printcraft points to two other potential commercial transactions: the Third Party Beneficiary Agreement and the "totality of the parties' dealings." The first suggested basis does not support application of I.C. § 12-120(3) because the Third Party Beneficiary Agreement was not an agreement between Printcraft and the defendants, but rather an agreement between the industrial park and the defendants. Thus, although Printcraft was asserting rights created under that agreement, there was no commercial transaction between the parties that gave rise to this litigation.

The second claimed basis suffers from the same defect. Printcraft contends that the lawsuit originated from "a series of interactions between the parties." However, as previously explained, there were no transactions between Printcraft and the defendants. Printcraft cites *Lettunich v. Key Bank National Association*, 141 Idaho 362, 109 P.3d 1104 (2005), for the proposition that claims arising in a "commercial context," even in the absence of a contract, constitute claims based upon a commercial transaction. However, in that case, the fraud claim was based upon statements allegedly made to the plaintiff by the defendant's employee. Thus, the "commercial context" clearly referred to conduct or transactions between the parties. Here, even if there are several commercial transactions that created the circumstances underlying the claims, none of those transactions are between the parties. Therefore, we hold that Printcraft's claims were not based upon a commercial transaction between the parties and we affirm the trial court's denial of attorney fees under I.C. § 12-120(3).

For the same reason, Printcraft is not entitled to attorney fees on appeal.

## IV. CONCLUSION

We reverse the district court's grant of SPU's motion under I.R.C.P. 60(b)(2). We affirm the district court's denial of the defendants' motion for JNOV as to the existence and breach of a duty to disclose and as to the amount of damages. We hold that the district court did not abuse its discretion in excluding jury instructions 16, 31, 34, and 38-42, nor in declining to submit Printcraft's question of punitive damages to the jury. We affirm the district court's order denying Printcraft's request for attorney fees below. Because both parties prevailed in part, we do not award costs or attorney fees on appeal.

Chief Justice BURDICK and Justices EISMANN, J. JONES and W. JONES **CONCUR**.

---

[5] While Waters was personally involved as an owner of many of the entities participating in the transactions that eventually led to Printcraft's leasing of the property, Printcraft, the only Waters-owned entity that is a party in this lawsuit, was not a party to any transaction involving the defendants.